IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LARRY B. DANIELS, | Cause No. CV 13-21-BLG-SEH-CSO |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

On February 12, 2013, Petitioner Larry B. Daniels filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Daniels is a state prisoner proceeding pro se.

On April 25, 2013, the Court ordered Respondents ("the State") to file documents from the record created in state court. The matter was stayed pending completion of postconviction proceedings in the state courts. On June 2, 2014, the stay was lifted.

After a careful review of the record, the Court concludes that Daniels' claims lack merit.

## I. Background

Petitioner Daniels ("Daniels") was convicted of deliberate homicide in connection with the shooting death of his adult son, Buddy Daniels ("Buddy"). He

is currently serving a term of 60 years in prison and will not be eligible for parole until he has served 20. Judgment (Doc. 10-30) at 2. At trial, Daniels asserted the shooting was justified. His federal habeas claims generally allege that he was unfairly prevented from fully developing that defense.

**A. Facts Presented at Trial**

Daniels was 66 years old at the time of the shooting. *Cf.* Trial Tr. (Doc. 10-24) at 460:20-22, 1461:7-9. He shared a large property and two houses with his son Buddy, age 43, Buddy's 14-year-old son H., and Daniels' 15-year-old son L. *Id.* at 484:6-11, 536:16-537:11, 1016:13-15. On the evening of May 21, 2009, Buddy and Daniels had both been drinking. Daniels' blood-alcohol concentration was 0.08 about six hours after his arrest. Buddy's was 0.10. He also had marijuana metabolite in his system. *Id.* at 731:3-733:21.

Daniels and Buddy began arguing at the dinner table. According to Daniels' testimony at trial – with which L. and H. essentially agreed – Buddy angrily ordered Daniels out of the south house, where they were all eating. Although Buddy demonstrated his anger by throwing and breaking two chairs, Daniels refused to leave until he had finished his pizza. Buddy approached Daniels. Daniels, without knowing how he got there, found himself on the ground. L. and H. said that Buddy struck Daniels or pushed Daniels down. Buddy then physically transported Daniels to the door. Daniels recalled Buddy "jumping on top of me,

headlock," and "being drug or thrown down the stairs" and out of the house. *See* Trial Tr. at 497:11-501:25, 517:21-520:17, 559:1-564:18, 584:20-587:16, 1158:10-12. At that point, standing just at the door of the house, Daniels and Buddy argued for a while longer. *Id.* at 525:16-526:23, 564:5-566:4.

H. testified that Buddy and Daniels then walked together down the sidewalk to the north house, which Daniels generally occupied. *Id.* at 502:23-503:22; *see also id.* at 487:23-488:3, 548:10-549:7, 576:11-16. At trial, Daniels testified that he went alone to the other house, went to the refrigerator to get a beer, and then went upstairs to his bedroom. *Id.* at 1064:19-1065:13.

Buddy was shot in Daniels' bedroom. Daniels' bed was just less than six feet from the bedroom door. On the opposite side of the bed from the door stood a nightstand. Daniels always kept a loaded gun on the nightstand, much as Buddy kept a loaded gun in a holster hanging on the frame of his bed in the other house. Trial Tr. at 529:6-530:2, 669:25-670:22. Although it was undisputed that Daniels always made his bed very neatly, the bed was disheveled in photographs of the scene after the shooting. *E.g., id.* at 576:17-581:4.

Before trial, Daniels told police in an interview that he was eight to ten feet away from Buddy and on the opposite side of the bed from the door when he fired.

Trial Tr. at 400:11-401:1, 402:3-22, 405:8-406:14, 407:20-408:4.[1] In a recorded phone call from the jail, Daniels told his girlfriend that Buddy "chased him" upstairs, hollering threats to "kick [Daniels'] ass." In his bedroom, Daniels picked up the gun and said, "No more." Buddy threatened to "shove that [gun] up your ass." Then, as Daniels described it, "when he did come at me, I pulled the trigger." *Id.* at 1208:21-1211:2, 1302:9-1304:1.

At trial, Daniels testified that when he entered his bedroom, Buddy was not pursuing him. He went around the bed to the nightstand, picked up the gun, and then went back to the other side of the bed, closest to the bedroom door. He sat down on the bed and was thinking about killing himself. At that point, he heard the door downstairs open, heard Buddy rushing up the steps toward the bedroom, and heard Buddy saying "You're not tough anymore" and threatening to "whip your ass." Daniels said Buddy saw the gun and responded by threatening to "stick that gun up your ass." Buddy entered the room, "straight-arm[ed]" Daniels, knocking him back on to the bed and pushing the pistol "into the air." Daniels recalled pulling the trigger. But the next thing he could recall was getting off the bed and stepping over Buddy's body to go downstairs to call 911. Trial Tr. at 1066:3-1068:6, 1074:3-1078:24. Daniels testified that he did not tell anyone he was scared

<hr>

[1]  Audio and video tapes of Daniels' post-event interview with a detective were played for the jury at trial, *see* Trial Tr. at 409:6-418:2, but they are not in the record before this Court. The account given here relies on portions of the trial transcript in which a witness describes the contents of the interview or agrees with examining counsel's description with no objection or correction by opposing counsel or another witness.

of Buddy or that he was sitting on the doorway side of the bed contemplating suicide because he was raised in a "rodeo culture" and did not want to admit those facts about himself. *Id.* at 1065:17-23, 1084:20-1087:4.

Three bullets were found, one in the ceiling over the stairwell outside Daniels' bedroom, one in the back of Buddy's head, and one in Buddy's back. Buddy's body lay at the top of the stairs. He was wearing only pajama bottoms. His hands were "right under his waist," suggesting he did not use his hands to break his fall. His feet were in the bedroom, and his head rested on the first step down from the top step. The trajectory of the shot that planted a bullet in the ceiling was consistent with the shooter standing by the nightstand and holding the gun at a normal height and angle. Trial Tr. at 630:5-632:5, 636:7-638:16, 669:2-15, 684:11-685:15, 695:3-10, 635:13-20, 998:5-999:15.[2]

The State's forensic pathologist, Dr. Bennett, testified that the shot to the back of Buddy's head was fired before the shot to his back. The shot to Buddy's head or neck fractured the base of the skull, adjacent to the brain stem. Fragments of bone and bullet severely damaged the cerebellum. To create that wound, the gun had to be held to Buddy's left and at least 36 to 48 inches away from traces of gunpowder found on his shoulder, that is, at least 48 or more inches away from the

---

[2] Although the evidence with respect to the bullet in the ceiling was incomplete, there was no dispute that three shots had been fired from the .22-caliber gun Daniels picked up from his nightstand or that the gun found on the kitchen counter after the shooting was the gun from the nightstand.

wound. Dr. Bennett also testified that the head wound rendered Buddy immediately unconscious, so that he dropped where he was, moving only "with whatever momentum he had before the shot was sustained." To create the bullet wound in Buddy's back, the gun had to be held at an angle and about 18 to 30 inches away. If Buddy was already on the ground when the shot was fired, then the gun was held lower than normal position. Trial Tr. at 902:3-919:10, 927:20-932:7.

Neither of the bullets that hit Buddy exited his body. Blood was pooled under Buddy's head wound and on the steps. There was a pool of blood in the middle of Buddy's back. Although there was no indication it had flowed down toward his feet or sides, it could have done so for a second or two. Some blood spatter was found in the stairwell opposite the bedroom and some was found on Buddy's body. *Id.* at 630:17-631:2, 633:19-635:11, 695:20-696:1, 817:12-818:4.

Dr. Bennett believed that Buddy was "moving more upright than not" when the head wound was sustained, based on the way the body fell. Trial Tr. at 926:10-22. A blood-spatter expert for the prosecution, Kevin Winer, testified that a spatter pattern on Buddy's upper mid- to left back, consisting of blood droplets projected from the entrance wound in Buddy's back, was caused not by the entry of the bullet[3] but by either the pumping of the heart or expulsion of air; and expulsion of

---

[3] Mr. Winer explained that the entry of a bullet causes blood to be projected only when the bullet itself encounters blood rather than bone, muscle, or tissue. In Buddy's case, the location of the wounds precluded that possibility. *See, e.g.*, Trial Tr. at 808:21-809:20.

air could have been caused either by the bullet's collapsing of the right lung or by impact from the fall of the body. The blood droplets constituting the pattern were oriented not down toward Buddy's feet but up toward his head. Therefore, Buddy could not have been upright when the blood was projected from the wound. *Id.* at 817:12-16, 818:8-824:17. In addition, there was no trace of blood having flowed down toward Buddy's feet from the head wound. Blood flowed toward his ear or his hair. The directionality of the spatter in the stairwell from the head wound was approximately the same as the directionality of the blood projected from the back wound. Consequently, it appeared that Buddy was not standing upright – that is, his shoulders were not above his hips – when either the head wound or the back wound began to bleed. *Id.* at 817:24-818:1, 831:1-833:8, 850:20-851:9. In closing argument, the State suggested Buddy was ducking and moving toward the door of the bedroom when Daniels shot him. *Id.* at 1421:16-20.

Daniels presented expert testimony from a forensic analyst suggesting the shots could have been fired in different order or that the orientation of Buddy's body could have changed within a few seconds of receiving a bullet wound, but the defense expert's testimony was not inconsistent with the State's witnesses' assessment of the evidence. *See generally* Trial Tr. at 949:18-1009:14. Daniels also presented expert testimony tending to show that a gun may be fired more rapidly than the person firing it can respond to a signal to cease firing; that is, it may be

impossible to avoid firing additional shots in rapid succession even when the first shot negates the reason to fire. *See generally id.* at 1220:13-1235:6. The .22-caliber gun used by Daniels could not fire a round without someone pulling the trigger, but someone familiar with the gun could "fire the gun as fast as you can pull the trigger." *Id.* at 757:11-25. This testimony would have been more persuasive if both shots to Buddy's body had been fired from the same distance.

After shooting Buddy, Daniels called 911. He told the dispatcher Buddy had "ripped his shirt off and shoved him down some stairs" and that he had told Buddy to "leave him alone" and "get away from him." According to Daniels' account to the dispatcher, Buddy followed Daniels to his house and went upstairs with him. Daniels picked up his gun. Buddy said to Daniels, "Oh, fuck you. What are you going to do with that gun?" Daniels said he was "broke down" and could not "whip [Buddy] anymore" and was "tired of it" and "pulled the trigger." He said he was "angry," "lost it," and "shot [Buddy] out of anger." When the dispatcher asked Daniels whether he was suicidal, he said "No." Trial Tr. at 314:25-324:10, 328:15-331:9, 1171:17-1172:11.[4]

---

[4] H. testified that he went to get L. so they could go over to Daniels' house to stop Buddy and Daniels from fighting. Just as they came out of the south house, L. heard "a smack or something hitting a wall," "not very loud," that was consistent with a gunshot. Trial Tr. at 567:8-568:11. H. said he also heard "what we thought might have been somebody getting punched or somebody getting smacked," like "a loud pop." *Id.* at 503:25-505:9. Both boys reported hearing only one such sound. H. thought Daniels looked "really mean," not "emotional or shook up," when he said to the boys as he came out of the north house, "'I just shot and killed Bud.'" *Id.* at 506:6-507:10, 568:5-11.

Daniels did not say Buddy attacked him or that he was afraid of Buddy until he was interviewed by police about two hours after the incident. Trial Tr. at 418:5-12, 459:16-18, 461:1-462:25, 465:12-13, 466:14-21. Daniels had an abrasion on his elbow, said his back hurt, and complained of anxiety at the sheriff's office, but a medical exam identified no significant injury. *Id.* at 372:5-24, 418:13-423:19, 467:3-468:12. Daniels told the police that Buddy tore his shirt when Buddy was "jerking him around" earlier in the evening at the steps. *Id.* at 449:17-450:6.

In the course of Daniels' direct examination, counsel asked him whether he knew of "any other instances in the past of Bud being violent." Trial Tr. at 1087:5-6. At that point, a recess was called. The trial judge noted that Daniels "could testify about his knowledge of Buddy's general propensity for violence," but inquiry into specific instances of Buddy's conduct required additional foundation. Daniels had so far testified only that "he was trying to repel . . . what he's testified to as an assault against him" without indicating that "he was recalling other specific instances of violence committed by" Buddy. Trial Tr. at 1093:12-1094:5.

The trial court then asked Daniels to make an offer of proof assuming, for the sake of avoiding another in-chambers conference, that Daniels would testify he was thinking of particular instances of Buddy's conduct. Trial Tr. at 1098:6-1099:10. Daniels wanted to refer to seven incidents. *See generally* Trial Tr. at 1099:13-1122:23. The trial court excluded five because they were too remote in

time or were not personally witnessed by Daniels, but it ruled that two others were relevant and could be admitted, provided Daniels testified that he relied in some way on those incidents in deciding to use deadly force. *Id.* at 1126:21-1132:9.

When trial recommenced, the following exchange occurred between Daniels and defense counsel:

| | |
|---|---|
| Counsel: | Before the break, Larry, I was getting into your understanding and knowledge of Bud. When Bud appeared at the top of the steps and he presented himself to you, was part of your decision to use force based on your understanding of Bud? |
| Daniels: | Yes. |
| Counsel: | And you've known Bud for, obviously, how many years? |
| Daniels: | Well, Bud would be 43. I helped deliver him. So I've known him since the day he was born. |
| Counsel: | And you've been with him and you've shared households? |
| Daniels: | Yes. He come to live with me when he was in the second grade and left my home when he was approximately 23 years old. |
| Counsel: | And so you know many specific things about him, correct? |
| Daniels: | Correct. |
| Counsel: | Now, in your decision to shoot Bud, did you take into consideration his propensity for violence? |
| Daniels: | Yes, I did. To a – the things just happened. That's what's going through my mind. I realize who Bud is, as any parent realizes who their children are. I know that – I'm about half gun-shy to say anything. |
| . . . | |
| Counsel: | So you said you know who Bud is? |
| Daniels: | Yes, I do. |

| Counsel: | And in that process of knowing who Bud is, you've observed him, correct? |
| --- | --- |
| Daniels: | Yes. |
| Counsel: | And does Bud have a reputation for being violent? |
| Daniels: | Yes, he does. |
| Counsel: | Does he have a reputation for fighting? |
| Daniels: | Yes, he does. |
| Counsel: | Does he have a reputation for a short fuse? |
| Daniels: | Yes, he does. |
| Counsel: | For holding grudges? |
| Daniels: | Yes, he does. |
| Counsel: | Now when you decided to shoot, you had just come from the main house, correct? |
| Daniels: | Correct. |
| Counsel: | And so that was really what was on your mind, is that fair to say? |
| Daniels: | The events of that evening, yes. |
| Counsel: | So you had just gotten beat up, is that correct? |
| Daniels: | Yes. |
| Counsel: | But nevertheless, when Bud appears at the top of the steps and he's in your room, you know who Bud is, including he has a reputation for being violent, for fighting; is that correct? |
| | [Objection as to leading and cumulative sustained.] |
| Counsel: | Is it fair to say your main motivating force that night was what happened that night? |
| Daniels: | Correct. |

Trial Tr. at 1135:7-1138:1; *see also id.* at 204:22-234:3 (argument on

defense motion in limine to bar State from offering other crimes or bad acts evidence against Daniels); Mont. Code Ann. § 46-13-109 (2007); Mont. R. Evid. 404(b).

At that point, the State objected and asked to adjourn to chambers once again. There, the State objected to what it assumed would happen next – that is, Daniels would begin testifying about Buddy's two specific acts of violence the trial court permitted him to introduce – and explained why Daniels should not be permitted to say more. Counsel for Daniels responded, "I'm disappointed that Mr. Guzynski had to jump up. My next comment is we were resting. I agree. We discussed whether he could establish the exquisite [sic] intent, what his statement of mind was, we chose to go away from specific acts and go through that. We went through general reputation. That's what we did." *Id.* at 1138:17-1139:11.

Thereafter, Daniels called witness Chris Rockholm, with the intention of eliciting testimony about the nature of the relationship between Daniels and Buddy. Rockholm knew Buddy in high school. He was permitted to say that Daniels was "good to us," both him and Buddy, when they were in high school, but recently the relationship between Daniels and Buddy was "not very healthy." The State objected. It sought to respond to Rockholm's testimony about Buddy's bad character by calling witnesses to testify that Daniels abused Buddy when Buddy was young. It also sought to require Daniels to testify that he relied on Buddy's

reputation for violence in deciding whether to use deadly force, and as Daniels had already testified that he relied on what happened that night, it suggested Daniels could not lay the proper foundation. Trial Tr. at 1255:11-1265:18. Defense counsel responded that Daniels had testified he "knew his son just as well as any father knows his son," so that evidence of Buddy's reputation should be admissible. *Id.* at 1268:21-1269:15. The trial court advised counsel that any further testimony by Rockholm that Daniels was "good" would open the door to the State's introduction of "its version of the defendant's true character." *Id.* at 1266:1-1267:18. Defense counsel released Rockholm. *Id.* at 1271:10-24.[5]

The jury was instructed on justifiable use of force, on mitigated deliberate homicide, and on deliberate homicide. The jury found Daniels' use of force was not justified and that he did not act under extreme mental or emotional stress. It convicted him of deliberate homicide. Trial Tr. at 1486:23-1487:7.

### B. Procedural History

Daniels appealed his conviction, asserting error in the trial court's rulings on the admissibility of evidence of Buddy's character and in its failure to instruct the jury that use of force might be justified in defense of an occupied structure. On November 8, 2011, the Montana Supreme Court rejected his claims and affirmed

---

[5]  At sentencing, Rockholm testified that both Buddy and Daniels were "fighters," but he had not seen Daniels get into any fights in "recent years." Sentencing Tr. (Doc. 10-29) at 58:22-61:1.

his conviction. *State v. Daniels*, 265 P.3d 623, 631-35 ¶¶ 22-36, 637 ¶ 46 (Mont. 2011). Daniels' conviction became final 90 days later, on February 6, 2012. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

Daniels signed his federal habeas petition and deposited it in the prison mail system on February 7, 2013. Pet. at 8, Pet'r Decl. ¶ C; *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule). On February 14, 2013, Daniels filed a petition for postconviction relief in the trial court. Because the federal petition contained at least one exhausted claim and because it appeared the state petition was untimely, the federal petition was stayed pending resolution of the state postconviction proceedings. *See* Order (Doc. 12) at 2; *see also, e.g.*, Order (Doc. 7) at 1-2 (citing *King v. Ryan*, 564 F.3d 1133, 1143 (9th Cir. 2009)).

The trial court denied the petition. Daniels appealed. On April 2, 2014, the Montana Supreme affirmed the trial court's denial of the petition. Order at 4 ¶ 9, *Daniels v. State*, No. DA 13-0304 (Mont. Apr. 2, 2014), *available at* http://supremecourtdocket.mt.gov (accessed Dec. 10. 2014). Rehearing was also denied. Order at 1, Daniels, No. DA 13-0304 (Mont. May 13, 2014). The federal stay was lifted on June 2, 2014. Order (Doc. 14).

## II. Claims

Daniels makes 11 claims for relief. All claims are addressed below, reorganized as follows:

Claim 1: The trial court unconstitutionally shifted to Daniels the burden of proving he was justified in using deadly force against Buddy. Fed. Pet. (Doc. 1) at 4.

Claim 2: The trial court violated Daniels' Sixth Amendment right to confront the witnesses against him by precluding cross-examination of State witnesses to elicit specific prior violent acts by Buddy and Buddy's reputation for violence. *Id.* at 6.

Claim 3: The trial court violated Daniels' Fifth Amendment privilege by requiring him to testify to lay foundation for admission of evidence showing justification. *Id.* at 4.

Claim 4: The trial court violated Daniels' Fourteenth Amendment right to due process by limiting a jury instruction's definition of "forcible felony" to aggravated assault and refusing to add burglary, because use of force may be justified for defense of an occupied structure just as use of force may be justified for personal defense. *Id.* at 7.

Claim 5: Counsel was ineffective for failing to obtain proper instructions on "all forcible felony's committed by Buddy Daniels that would also have justified Larry Daniels use of force." These forcible felonies included intimidation, simple assault, partner or family member assault, and stalking. Counsel also failed to obtain from Daniels all relevant testimony supporting his use of force. *Id.* at 4; *see also id.* at 7; State Pet. (Doc. 1-1) at 22-23, 25 ¶¶ 54-55.[6]

Claim 6: Counsel was ineffective in failing to question Daniels "to lay proper foundation in support of calling all relevant defense witnesses." Fed. Pet. at 6.

Claim 7: Counsel were ineffective for failing to preserve exculpatory evidence of bruising on Daniels' body in the days after the incident and counsels' appointment. State Pet. at 16, 26 ¶ 58.

---

[6] In his Federal Petition, Fed. Pet. at 6, Daniels purports to incorporate by reference his state petition for postconviction relief (Doc. 1-1). Although the Court will deem the state petition, as incorporated, to be part of the federal petition, *cf.* Fed. R. Civ. P. 10(c), the two are referred to here as the Federal Petition and the State Petition for ease of reference.

Claim 8:     Counsel were ineffective because they failed to arrange for
             Daniels to listen to recorded witness statements, thus preventing
             him from participating in his defense at a critical pretrial stage.
             *Id.* at 18, 25-26 ¶¶ 56-57.

Claim 9:     Counsel were ineffective with respect to Daniels' decision to
             testify. They failed to explain Daniels' right not to testify. They
             told him he would not have to testify as other witnesses could
             present testimony in support of a justification defense, and they
             did not assert Daniels' right not to testify at trial. These errors
             resulted in Daniels' testifying even though he did not want to,
             violating his Fifth Amendment privilege. *Id.* at 20.

Claim 10:    Counsel were ineffective in failing to explain that Daniels would
             have to testify only to lay foundation to support the calling of
             other defense witnesses to show justification. Daniels was
             therefore unprepared to testify and did not understand what
             testimony was required of him. *Id.* at 21-22, 24 ¶¶ 51-52.

Claim 11:    Counsel were ineffective in abandoning the self-defense theory.
             *Id.* at 25 ¶ 53.

### III. Analysis

After reviewing Daniels' claims in light of the trial transcript, the Court is

persuaded that the most efficient means of addressing the petition is to consider

each claim on the merits. The Court will not consider issues of exhaustion, default,

or how to apply the standards of 28 U.S.C. § 2254(d) where a state prisoner is not

represented by counsel and there is no evidentiary hearing in state postconviction

proceedings. *See, e.g., Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)

(holding that state courts' factual findings may be unreasonable under § 2254(d)(2)

where the fact-finding "process employed by the state court is defective"); *cf.*

*Martinez v. Ryan,* __ U.S. __, 132 S. Ct. 1309, 1317 (2012) ("While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record.").

Generally, in federal habeas proceedings, when a state prisoner contends that his conviction was invalidated by unconstitutional trial error, he is entitled to relief only if the error had "a substantial and injurious effect on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). "[W]hen a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict[.]'" *Fry*, 551 U.S. at 121 n.3 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). When a state prisoner contends that his conviction was invalidated by unreasonable performance by defense counsel, he is entitled to relief only if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

**A. Impermissible Burden-Shifting (Claim 1)**

The instructions received by the jury thoroughly refute the suggestion that the State's burden was shifted to Daniels.

The jury was instructed that the State must prove Daniels "was not justified in his use of force," Instr. No. 20 (Doc. 10-25 at 21), and that "the State has the

burden of proving beyond a reasonable doubt that the Defendant's actions were not

justified," Instr. No. 26 (Doc. 10-25 at 27). The jury was also instructed:

> A person is justified in the use of force or threat to use force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or serious bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or another, or to prevent the commission of a forcible felony.
>
> "Forcible felony" means any felony which involves the use or threat of physical force or violence against any individual.
>
> Aggravated assault is a forcible felony. A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another or purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death in another.
>
> . . .
>
> If you find that [Defendant] has offered evidence of justifiable use of force, but that the State has failed to prove beyond a reasonable doubt that the Defendant's actions were not justified, you must find the Defendant not guilty.
>
> The Defendant has offered evidence of justifiable use of force in this case. – You are to consider the following requirements of the law in determining whether the use of force claimed by Defendant was justified:
>
> (1)    The danger of harm to the Defendant must be a present one;
>
> (2)    The force threatened against the Defendant must be unlawful;
>
> (3)    The Defendant must actually believe that the danger exists, that is, use of force is necessary to avert the danger and that the kind and amount of force which the defendant uses is necessary;

> (4)  The Defendant's belief, in each of the aspects described, must be reasonable even if it is mistaken.
>
> (5)  A person who is lawfully in a place or location and who is threatened with bodily injury or loss of life has no duty to retreat from a threat, or summon law enforcement assistance prior to using force.
>
> Even if you determine the use of force by Defendant was not justified, the state still has the duty to prove each of the elements of the crime charged beyond a reasonable doubt.

Jury Instrs. Nos. 24-27 (Doc. 10-25 at 25-28).

The jury was also instructed on mitigated deliberate homicide as a lesser included offense of deliberate homicide; that is, if it found that Daniels purposely or knowingly caused Buddy's death without justification, but that he acted "under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse," then it should find him guilty of mitigated deliberate homicide. Jury Instr. No. 23 (Doc. 10-25 at 24). And the jury was clearly and correctly instructed on the verdicts it must deliver as well as the order in which it must consider and deliver them. *See also* Trial Tr. at 1402:22-1405:4 (explaining verdict form to jurors).

A jury is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Reading the instructions in light of the evidence presented at trial, the Court cannot conclude that the jury might have convicted Daniels of deliberate homicide even though it believed Daniels' use of force against Buddy might have been reasonable. The jury was fully advised of what constituted justifiable use of

force and who had the burden of proving what by what standard of proof. The jury believed, beyond reasonable doubt, that Daniels' use of deadly force was unreasonable. Claim 1 should be denied.

### B. Presentation of Evidence of Justification (Claims 2, 3, 6, 8, 9, 10, 11)

Daniels contends that he should have been permitted to introduce additional evidence showing Buddy's violence or dangerousness. He wanted to introduce evidence of Buddy's reputation and specific acts of violence in order to demonstrate why his own fear and his own choice to use deadly force were reasonable. *See, e.g.*, Trial Tr. at 204:22-234:3, 984:2-988:6, 1099:10-1132:9. And he contends that he should have been able to do so by means other than his own testimony. *E.g.*, State Postconviction Pet. at 20.

Montana's Rules of Evidence arguably do not allow the State to introduce evidence of a *defendant's* violent character in response to the defendant's introduction of evidence of the *victim's* violent character. *See* Mont. R. Evid. 404(a)(1), Comm'n Comments 1977(a) paras. 3, 6 (suggesting prosecution's rebuttal is limited to "evidence of the peaceful character of the victim to rebut evidence offered by the accused showing that the victim was the first aggressor."). By contrast, for example, when a defendant offers evidence of the victim's violent character, the Federal Rules of Evidence would allow the prosecution both to rebut the victim's violent character and also to "offer evidence of the defendant's same

trait." Fed. R. Evid. 404(a)(2)(B). *See also, e.g.*, Trial Tr. at 209:1-214:6, 216:17-217:24, 233:15-21. In addition, Montana's Rules of Evidence specifically provide that "where the character of the victim relates to the reasonableness of force used by the accused in self-defense, proof may also be made of specific instances of that person's conduct." Mont. R. Evid. 405(b).[7]

Under these Rules, evidence of a "pertinent" trait of the victim's character, whether introduced in the form of reputation or specific acts, is admissible for the purpose of showing the victim acted in conformity with his or her character on a particular occasion. This evidence is, in other words, relevant and admissible propensity evidence, an exception to the otherwise broad prohibition on propensity evidence. *See* Mont. R. Evid. 404(a). Consequently, it is possible to argue that, once some evidence was admitted tending to show that Daniels acted in self-defense, Daniels was entitled to introduce evidence of Buddy's specific violent acts in order to show that Buddy was the aggressor and Daniels' use of deadly force was reasonable; and, at the same time, the State was *not* permitted to respond by introducing specific instances of Daniels' violent character through reputation or specific acts, *compare, e.g.*, Trial Tr. at 217:4-24, unless Daniels introduced evidence of his own character, Mont. R. Evid. 404(a)(1). Moreover, it is also

---

[7] The Commission Comments to Mont. R. Evid. 405(b) note "This method of proof is the most persuasive of the three contained in the rule and is also the most likely 'to arouse undue prejudice, to confuse and distract, to engender time-consuming side issues and to create risk of unfair surprise.'" Comm'n Comments 1977(b) para. 1 (quoting McCormick, Handbook of the Law of Evidence 443 (2d ed. 1972)). The long discussions and sidebars at trial bear this out.

arguable that a defendant's right to present such evidence cannot be conditioned on his knowledge of the victim's character. *Compare, e.g.*, *State v. Montgomery*, 112 P.3d 1014, 1018 ¶ 19 (Mont. 2005).

The Court makes no decision on the validity of these arguments; it merely notes their availability. It will assume, for the sake of argument, that these arguments were fully developed, valid, and presented on grounds of the federal constitutional right to present a defense, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); or the Fifth Amendment privilege or Sixth Amendment right to the assistance of counsel, *see Brooks v. Tennessee*, 406 U.S. 605, 612 (1972). Even so, Daniels must still show that the limitations on his ability to present his justification defense had a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 623. To the extent Daniels asserts trial counsel performed unreasonably in this context, he must show a reasonable probability that he would not have been convicted if the limitations had been altered or removed. *Strickland*, 466 U.S. at 694.

Daniels cannot make the requisite showings of prejudice. First, whether Daniels testified or not, the undisputed events earlier in the evening clearly and unequivocally established Buddy's willingness to behave in a violent manner toward Daniels. L., for example, testified that he had never "seen Buddy so angry" and that Buddy was "zoned out," "[i]mpervious to other things," and "in a rage."

Trial Tr. at 597:11-598:13. Everyone agreed that Buddy shoved his father down a short flight of steps. The other acts Daniels sought to introduce[8] had significantly less probative value than what the jury already knew about Buddy's behavior on the night in question.

Second, even if Daniels had not testified, and even if other witnesses had been permitted to testify about Buddy's reputation or his fights in Columbia Falls and Wyoming, the result would not necessarily have been favorable to Daniels. The parties agreed Daniels knew of Buddy's reputation and fights, and that knowledge tended to reinforce other evidence showing that Daniels was not afraid of Buddy despite his propensity for violent conduct. For example, Daniels insisted on staying to finish his pizza despite Buddy's violent display. He continued to talk with Buddy after being pushed down the steps. There was no evidence that he considered in any way how to deal with Buddy's violence. No matter who testified or what evidence about Buddy came in, the state argued that Daniels had a serious

---

[8] The acts were briefly described in chambers. Within a couple of days in 1994, Buddy twice entered Daniels' trailer and tack shop demanding money. On both occasions, the two "got into a fist fight." On the first occasion, Daniels pulled Buddy's shirt over his head and hit him. Buddy left. On the second occasion, Daniels showed Buddy a gun, and Buddy left. Counsel for Daniels asserted that these incidents were relevant because on the present occasion, Buddy again saw Daniels with a gun but did not retreat as he had before, thus justifying Daniels' decision to fire. Trial Tr. at 1099:13-1101:12.[8] A third incident was Buddy's finishing in second place in an organized mixed martial-arts contest 14 or 15 years previously. *Id.* at 1107:2-1108:7. The fourth incident was unopposed by the State, pending the laying of appropriate foundation. It involved Daniels' witnessing of a bar fight in Columbia Falls in 2007 in which Buddy severely beat another man. *Id.* at 1116:4-1117:15. Counsel also referred to other fights, in 1992 and in 2008 or 2009, that Daniels did not witness but heard about. *Id.* at 1117:17-1120:17. Buddy told Daniels about another fight, in 2004, at a barbecue in Wyoming. *Id.* at 1122:13-23. *See also* n.6, *supra*.

"apple does not fall far from the tree" problem. Trial Tr. at 217:10-13. Other witnesses' testimony about Buddy was significantly less probative than Daniels' knowledge of his own son, and all the evidence showed that Daniels and Buddy, father and son, related to each other in a way that took a certain degree of violence for granted. And to the extent any defense witness drew a contrast between Buddy and Daniels, the door would be opened to the State to rebut Daniels' character. *E.g.*, *id.* at 1258:15-1262:22; Mont. R. Evid. 404(a)(1).

Third, Daniels was not "compelled" to testify. Independently of any testimony about Buddy's reputation or prior acts of violence, the story Daniels told the police and the story he told his girlfriend were not compatible with other compelling evidence in the case. *See, e.g.*, Trial Tr. at 1414:2-1421:2. To the extent counsel advised him to testify, the advice was plainly reasonable. To the extent Daniels claims he would have testified to something other than a reliance on what happened that evening if only he had had a better understanding of what would make Buddy's other acts of violence admissible, he is, as the Montana Supreme Court said, complaining of a lost opportunity "to alter his testimony." Order at 3-4 ¶ 6, *Daniels*, No. DA 13-0304. The law does not remedy losses of that kind.

Finally, counsel did not "abandon" the self-defense theory. *E.g.*, Trial Tr. at 1458:9-1460:21, 1474:24-1476:20. The jury did not believe that the threat Buddy posed to Daniels was sufficient to justify Daniels' use of deadly force.

There is no reasonable probability that a reasonable juror would have retained reasonable doubt if only persons other than Daniels had been permitted to testify about Buddy's reputation or specific acts of violence. Likewise, the trial court's ruling that Buddy's acts would not be admitted unless Daniels had them in mind when he exerted deadly force did not have a substantial or injurious effect on the verdict. Claims 2, 3, 6, 8, 9, 10, and 11 should be denied.

### C. Forcible Felonies (Claims 4 and 5)

The Montana Supreme Court held, as a matter of state law, that Buddy's entry into the north house was not a trespass. *Daniels*, 265 P.3d at 636-37 ¶¶ 42-45. But even if there was some evidence on the other side of that question, *see, e.g.*, Trial Tr. at 576:7-577:7, 1030:12-1032:22, any error was harmless. The evidence that Buddy was willing to assault Daniels' person was uncontroverted, yet the jury did not believe the level of force Daniels used against Buddy was justified. There is no reason to believe the jury might have found Daniels was justified in using deadly force to repel an offense of less significance than aggravated assault. Claims 4 and 5 should be denied.

### D. Failure to Preserve Evidence of Bruising (Claim 7)

No one would have been surprised to see some bruising on Daniels' body after Buddy thrust him down the steps. There is no reason to believe Daniels had unusually severe bruising. At any rate, such evidence would not alter the picture

presented by Daniels' acts and omissions in response to Buddy's conduct. Claim 7 should also be denied.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

All of Daniels' claims for relief rest on the proposition that he might have been acquitted if he had been permitted to present his justification defense more fully and without (or with less of) his own testimony. But this was not a case where the jury was altogether prevented from considering a defense. Nor is it a case where additional evidence of Buddy's violence or aggressiveness was needed. All the testimony in the case showed that Daniels and Buddy related to each other in a manner that tended to include violence of some degree. Undisputed evidence showed that Buddy behaved in a violent manner toward Daniels shortly before

Daniels killed Buddy. Even so, Daniels' justification defense was defeated by Daniels' varying stories about how Buddy's attack on him occurred, combined with forensic evidence tending to show Buddy was moving away from Daniels and out the door when Daniels killed him. A careful review of the trial transcript compels the conclusion that Daniels was not deprived of a fair trial or a fair opportunity to present his self-defense theory. Because Daniels cannot show that any of the errors he alleges either had a substantial and injurious effect on the verdict or gave rise to a reasonable probability of a different result, he cannot obtain federal habeas relief.

Daniels's claims present no open questions and nothing on which reasonable jurists could disagree. Both the law and the facts relating to his claims are well-established on the record before the Court. They preclude relief. A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The Petition (Doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Daniels.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Daniels may object to this Findings and Recommendation within 14 days.[9]

28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo

determination by the district judge and/or waive the right to appeal.

Daniels must immediately notify the Court of any change in his mailing

address by filing a "Notice of Change of Address." Failure to do so may result in

dismissal of this case without notice to him.

DATED this  15th day of December, 2014.


/s/ Carolyn S. Ostby
Carolyn Ostby
United States Magistrate Judge

---

[9] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.